IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 19, 2020

## KANE STACKHOUSE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 98164     Scott Green, Judge**

_____

### No. E2019-01651-CCA-R3-PC

_____

The petitioner, Kane Stackhouse, appeals the denial of his petition for post-conviction relief, which petition challenged his 2008 Knox County Criminal Court jury convictions of first degree murder and especially aggravated robbery. In this appeal, the petitioner claims, as he did below, that he is entitled to post-conviction relief because he was deprived of the effective assistance of counsel at trial and on appeal. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Gerald L. Gulley, Knoxville, Tennessee, for the appellant, Kane Stackhouse.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Knox County Criminal Court jury convicted the petitioner of second degree murder, first degree murder in the perpetration of an attempted robbery, first degree murder in the perpetration of a robbery, first degree murder in the perpetration of an attempted theft, first degree murder in the perpetration of a theft, and especially aggravated robbery related to the November 11, 2006 shooting death of David Lindsey. *See State v. Kane Stackhouse*, No. E2009-01669-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Knoxville, Nov. 12, 2010). The trial court merged the four felony murder convictions and imposed a single sentence of life imprisonment for the conviction. At the urging of the prosecutor, the trial court did not merge the second degree murder conviction into the first degree murder conviction but instead imposed a sentence of 23 years for that conviction to

be served concurrently to the petitioner's life sentence. *See id.*, slip op. at 9. The court imposed a consecutive sentence of 20 years' incarceration for the petitioner's conviction of especially aggravated robbery. On direct appeal, the petitioner challenged only the denial of his motion to suppress the statement he provided to the police following his arrest. This court affirmed the denial of the motion to suppress and affirmed the petitioner's convictions and accompanying sentence of life plus 20 years' imprisonment but remanded the case to the trial court for the merger of the petitioner's conviction of second degree murder into his conviction of first degree murder. *See id.*, slip op. at 9-10.

The petitioner filed a timely pro se petition for post-conviction relief in October 2010, arguing, among other things, that he was deprived of the effective assistance of counsel at trial and on appeal. As part of his claim of ineffective assistance of counsel, the petitioner alleged that appellate counsel performed deficiently by failing to advise him that this court had denied appellate relief, failing to pursue second-tier appellate review by our supreme court, and failing to withdraw in time for the petitioner to pursue second-tier appellate review on his own. Following the appointment of counsel in December 2011, the petitioner filed an amended petition for post-conviction relief in May 2012, reiterating his claims of ineffective assistance of counsel and specifically asking for the remedy of the opportunity to pursue a delayed appeal of this court's opinion to our supreme court. In September 2013, upon the agreement of the parties, the post-conviction court granted the petitioner's request to pursue a delayed appeal to our supreme court and ordered that the remaining claims of ineffective assistance of counsel be held in abeyance pending the action of the supreme court.[1] The supreme court denied the petitioner's application for permission to appeal on January 16, 2014, and the petitioner filed another amended petition for post-conviction relief.

In his January 2014 petition, the petitioner added a claim that his counsel performed deficiently by failing to advise the petitioner to testify at trial. The petitioner also incorporated by reference the claims for post-conviction relief made in his earlier petitions.

At the July 11, 2019 evidentiary hearing, the petitioner alleged that, during his trial, Judge Baumgartner "had to take five, ten minute breaks every now and then but

---

[1]     By the time the petitioner filed his petition for post-conviction relief, Judge Richard Baumgartner, who presided over the petitioner's trial, had resigned after pleading guilty to one count of official misconduct. *See State v. Letalvis Cobbins, LeMaricus Davidson, and George Thomas*, No. E2012-00448-SC-R10-DD, slip op. at 1 (Tenn. May 24, 2012) (Order). Judge Mary Beth Liebowitz was assigned to preside over the petitioner's post-conviction case until her retirement in August 2014. Original post-conviction counsel, who also pursued the delayed Rule 11 appeal, retired from the practice of law, and the post-conviction court appointed new counsel to represent the petitioner on the remaining post-conviction claims. The post-conviction court permitted new post-conviction counsel to withdraw and appointed substitute counsel in May of 2017.

they wasn't that long, I guess bathroom breaks." The petitioner said that he "felt like that [Judge Baumgartner] wasn't paying attention to the trial at hand."

The petitioner testified that trial counsel began representing him roughly nine months prior to trial and that he only met with counsel "[m]aybe three, four times" for 10 to 20 minutes. He claimed that trial counsel never told him "what's going to take place or how it's going to take place." He said that he told trial counsel that he "didn't understand the process of what was going on, and I didn't know there was a process of me getting on the stand during trial. I was not understanding of that until I got to prison." The petitioner insisted that trial counsel "never really enlightened to me about getting on the stand. Besides are you getting on the stand? And I said, no, I don't think so." The petitioner said that he believed that, had he testified at trial, the outcome would have been different. The petitioner said that, had he been called to the stand, he would have testified as follows:

> After the meeting of Aaron Allen and two of his friends in the Food City parking lot, I left that parking lot, walked down the street . . . . As I was walking down the street on the right side of the highway there the traffic comes towards me, I seen a light in the cab of a truck. I walked toward the parking lot of where it was. I sat down the bag near the -- the road. I walked towards the vehicle. As I got to the vehicle, I brandished the revolver. I told him give me your money and your keys. He said all I have is $60.00. I got the $60.00. He handed me a ring full of keys and a key by itself.

> I ran away. I got towards my bag again. Once I got towards my bag, which was about 20 or 30 yards away from the cab, I was going through the keys not knowing what I was doing and I heard a voice behind me say, hey, hey. And I turned around and when I turned around, I seen the individual and he was coming towards me. And I don't know, I just . . . snapped and I started screaming at him pointing the gun chasing him just ahhhh. Just chasing him and when we were in the chase, the gun goes off. We turn the corner. He falls. I start getting close. He falls. The gun goes off again. His head shoots back. And he starts to snore.

The petitioner said that, after shooting the victim, he picked up his bag, ran away, and eventually hid in some bushes, where he "passed out from shock or whatever." He said that he thought that this testimony would have helped the jury "understand my point of view that it wasn't intentional. It was accidental and I was not in my right mind and I was

a child." The petitioner insisted that he did not recall the trial court's having questioned him about his right to testify.

The petitioner also complained that he "was never given a discovery of evidence." He said that trial counsel did not show the petitioner any of the audio or video recordings that were included in the discovery materials prior to trial.

The petitioner testified that at the time of the offenses he suffered from "anxiety problems" and that he was "not only coming off of alcohol abuse, but I was also . . . using prescription -- over the counter prescription meds like Benadryls and hydrocodone, stuff like that." He said that he alerted trial counsel to his mental health issues and told trial counsel that he had been prescribed "Lithium, Cogentin, Risperdal, [and] a generic form of Prozac" at the jail. He said that despite that his first attorney had "acquired funds through Baumgartner for a medical therapist to do a medical evaluation on me," trial counsel did not pursue the evaluation.

During cross-examination, the petitioner acknowledged that he had been represented by other attorneys before trial counsel was appointed to the case and that those attorneys had discussed with him most of the discovery materials as well as the trial process. The petitioner acknowledged that he robbed the victim at gunpoint and that he then chased the victim while holding the gun. He admitted that the gun went off twice, striking the victim first in the calf and then in the head. He acknowledged that he provided essentially the same account to the police that he had provided on direct examination and that the recording of that statement was played at trial. The petitioner insisted that he "did not want to go to trial" and that he "was trying to push for a second degree murder and especially aggravated robbery." The State made no such offer.

Trial counsel testified that he was "almost the fifth lawyer" to represent the petitioner and that the trial judge called him personally at his office to appoint him to the petitioner's case. He said that he discussed the case with the petitioner's previous lawyer and obtained files from all of the lawyers who had represented the petitioner. Additionally, he obtained some discovery materials from the State.

Trial counsel described the petitioner's as

one of the kinds of cases where you really had to think about whether it was a mental issue at all. And as I got to know him better and meet with him better, I decided that there was not a mental issue. I made that decision. That was a decision I made with him, because I talked to him about it.

-4-

He recalled that the petitioner's previous attorney "was convinced that [the petitioner's] affect was part of a mental condition, but in good conscience I could not go that [way] either mental incompetency or insanity." He said that it might have been possible to find "a doctor that could have helped me with that," noting that the petitioner's "affect then was he was very hard to reach."

Trial counsel testified that "the jail records will reflect this, that I saw him more than four times" and that he met with the petitioner following each court appearance "trying to explain to him, hey, we're moving it for this reason or we're not going to trial this time for this reason." He said that he utilized the services of a private investigator, who "enabled me to get to some interesting witnesses" for the suppression hearing. After the suppression hearing, trial counsel approached the prosecutor in hopes of pursuing a plea agreement, but the State insisted upon going to trial. Trial counsel testified that he attempted to explain the felony murder law to the petitioner, but the petitioner just did not seem to grasp the law. He said that his only trial strategy was to attempt "to nullify the felony murder and they had to find second degree murder."

As to the petitioner's claim that trial counsel did not prepare him to testify at trial, trial counsel said, "I would have never let him testify at this trial. I mean . . . we probably did talk about it a couple of times. Me saying, 'you're not testifying in this trial.'" Trial counsel explained that there was "an hour and a half of video confession and statements going into excruciating detail. So I couldn't put him on." In addition to the videotaped confession, the police captured on video the petitioner's leading them to the murder weapon. Trial counsel said that "the investigation was extremely thorough" and that he did "the best I could to keep the boat afloat by bailing it out," referring to the overwhelming evidence of the petitioner's guilt. He said that after the trial court denied the motion to suppress, "we were in trouble."

During cross-examination, trial counsel acknowledged that he was not an expert in mental health and admitted that "if I had to regret anything, I regret not going ahead and getting him evaluated." Trial counsel agreed that the petitioner had a "flat affect . . . at first" but said that the petitioner "loosened up, talked to me, explained things" as they got to know one another. He noted that, "[e]ven if a doctor says he has maybe lower intelligence or something like that, which I didn't even agree with," it would not have changed the outcome of the trial.

Trial counsel admitted that he did not play any of the audio or video recordings for the petitioner, but he said that "when I told [the petitioner] everything that was on it with my notes, he agreed that he had been there and done that." He added that the petitioner did not ask to see any of the recordings because "[h]e knew they existed and what they consisted of."

Trial counsel acknowledged that the issues about Judge Baumgartner's potential incompetency due to drug abuse came to light after the petitioner's trial and that he and 22 other criminal defense attorneys had discussed the petitioner's case, along with many others, in an effort to discern whether Judge Baumgartner "could have been affected by some kind of narcotic" during the trial. Trial counsel said it was his opinion that, "if you're going to raise that kind of argument in good faith, you have to see some indication that the member of the judiciary is not behaving in an intelligent, effective way." In the petitioner's case, trial counsel said, "Judge Baumgartner was clear as a bell. He was not behaving in any way that . . . affected his intelligence." He added that Judge Baumgartner was on his "A game all the way through."

Trial counsel said that he did not seriously consider calling the petitioner as a witness at the suppression hearing because he "considered that to be too risky." He said that he could not have contained the petitioner's testimony to the suppression issues alone.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. In a written order denying post-conviction relief, the post-conviction court concluded that the petitioner's claim that he and trial counsel did not discuss whether he should testify at trial was belied by the trial record. Additionally, the court concluded that, even if the petitioner's claim were true, he could not establish prejudice flowing from the error because "the chance that the petitioner's testimony would have exonerated him is so remote as to be non-existent." Indeed, the court concluded, "the very real possibility exists that, had the petitioner testified to what he now says transpired, the jury may have convicted the petitioner of premeditated first degree murder, rather than second degree murder." The post-conviction court also "accredit[ed] trial counsel's testimony that there existed no issue with the trial court's fitness to preside, nor was there an ethical basis to request a mental evaluation of the" petitioner.

In this timely appeal, the petitioner claims entitlement to post-conviction relief on grounds that he was deprived of the effective assistance of counsel at trial. He argues that trial counsel performed deficiently by failing to provide him with discovery materials, failing to keep him apprised of the case, and failing to request a mental health evaluation.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's

findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record supports the denial of post-conviction relief. Trial

-7-

counsel's accredited testimony established that he met with the petitioner several times and that he reviewed the discovery materials with the petitioner, even though he did not play the audio and video recordings for the petitioner. No evidence suggests that, had the petitioner had hard copies of all the discovery materials or reviewed the recorded evidence, the result of the proceeding would have been different. Additionally, although trial counsel expressed regret at not having the petitioner evaluated prior to trial, his testimony was clear that he did not actually believe an evaluation was necessary and that he would have been doing it "to cross a T." Importantly, the petitioner presented no evidence to suggest that he suffered from any mental disease or defect, much less any evidence that would have called into question the outcome of the trial.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE